# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JEFFREY LAYDON, on behalf of himself and all others similarly situated,

        Plaintiff,

- against -

CREDIT SUISSE GROUP AG, BANK OF AMERICA CORPORATION, J.P. MORGAN CHASE & CO., HSBC HOLDINGS PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, WESTLB AG, UBS AG, ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, THE NORINCHUKIN BANK, CITIBANK NA, BANK OF TOKYO-MITSUBISHI UFJ LTD, RABOBANK GROUP, ROYAL BANK OF CANADA, and SOCIETE GENERALE,

        Defendants.

Docket No.

**CLASS ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Jeffrey Laydon ("Plaintiff"), by his undersigned attorneys, brings this action against Defendants Credit Suisse Group AG, Bank of America Corporation, J.P. Morgan Chase & Co., HSBC Holdings plc, Barclays Bank plc, Lloyds Banking Group plc, WestLB AG, UBS AG, Royal Bank of Scotland Group plc, Deutsche Bank Ag, The Norinchukin Bank, Citibank NA, Bank of Tokyo-Mitsubishi UFJ Ltd., Rabobank Group, Royal Bank of Canada, and Société Générale (collectively, "Defendants"), pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. ' 1, *et seq.* (the "CEA"), Sherman Antitrust Act, 15 U.S.C. § 1, the Illinois Consumer Fraud and Deceptive Trade Practices Act (the "Illinois Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, and Illinois common law on behalf of himself and all others who purchased or sold

Exchange Traded Libor-Based Derivatives[1] on either the Chicago Mercantile Exchange ("CME") or Chicago Board of Trade ("CBOT"), during the period of at least January 1, 2006 through and including December 31, 2009 (the "Class Period").

Plaintiff's allegations as to himself and his own actions are based upon his personal knowledge and to information obtained during the course of his attorneys' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' unlawful manipulation of The London Interbank Offered Rate ("Libor"), a daily reference rate based on the interest rates at which banks borrow unsecured funds from other banks in the London wholesale money market (or interbank lending market).

2.      **Overt Acts and Means of Manipulation**:  Beginning as early as 2006 and continuing though at least 2009, the Defendants herein, as Libor contributor banks (as further described below), intentionally caused and created artificial Libor rates, including artificially suppressed Libor rates.  Libor is owned by the British Bankers' Association (the "BBA"), an organization funded primarily by subscriptions from its members.

3.      The BBA selects only 16 contributor banks (most of which are Defendants here) to provide daily rate quotes for the calculation of Libor. The BBA website states that this "reference panel of banks ... reflects the balance of the market by country and by type of institution.  Individual banks are selected within this guiding principle on the basis of reputation, scale of market activity, and perceived expertise in the currency concerned."  For each currency

---

[1] Exchange Traded Libor-Based Derivatives are defined as and include: CME 1-Month Eurodollar futures and options contracts, CME 3-Month Eurodollar futures and options contracts, CBOT mini-sized Eurodollar futures and options contracts, and CBOT 5-Year, 7-Year, 10-Year, and 30-Year Interest Rate Swap futures and options contracts.

and maturity, Libor contributor banks submit to Thomson Reuters ("Reuters") the rate at which a contributing bank believes it could borrow funds should it wish to do so, by asking for and then accepting inter bank offers in a reasonable market size just prior to the fix time (11:00 am UK time). For the U.S.-denominated Libor, the Defendants, as contributor banks, submitted daily rate quotes to the BBA, the middle 8 rate quotes submitted are converted into US Libor rates via a simple arithmetic mean. The rates submitted by each contributor bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon the rate a bank could borrow funds at, not the rate at which the bank actually borrowed funds. Thus, Libor depends on the integrity of the contributor banks. Rather than submit Libor rates which reflected the rate that each bank could borrow funds should it wish to do so, by asking for and then accepting inter bank offers in a reasonable market size just prior to the Libor fix time of 11:00a.m. U.K. time, the Defendants, during the Class Period, as Libor contributor banks, knowingly submitted false Libor rates which did not reflect their true borrowing costs with the intent to create artificial Libor rates.

4. **Causation**: Libor serves as the pricing benchmark (or "underlying commodity") for the most actively exchange-traded Libor-based interest rate futures, options and swap contracts in the world, including: CME 1-Month Eurodollar futures and options contracts, CME 3-Month Eurodollar futures and options contracts, CBOT mini-sized Eurodollar futures and options contracts, and CBOT 5-Year, 7-Year, 10-Year, and 30-Year Interest Rate Swap futures and options contracts (collectively "Exchange Traded Libor-Based Derivatives"). As an intended, proximate and direct result of Defendants' manipulation of Libor, billions (if not trillions) in dollars of Exchange Traded Libor-Based Derivatives traded at artificial and manipulated levels, including artificially suppressed levels, during the Class Period.

5. **Manipulative Intent**: By reporting false Libor rates, Defendants intended to manipulate the Libor rates and the prices of Exchange Traded Libor-Based Derivatives. The submission of false reports, such as the submission of false Libor rates, is a traditional means of manipulation. *See, e.g. In re Natural Gas Commodity Litig.* 337 F.Supp.2d 498 (S.D.N.Y. 2004)(Plaintiffs successfully alleged that by falsely reporting data on trades of natural gas in the physical market, the defendant energy trading companies were able to manipulate the price of natural gas futures contracts for their own benefit). Defendants' motivations to manipulate were many. Among other reasons, they were loath to disclose the true risk premium (based upon their financial conditions) that the market was attaching to them during the financial crisis. Disclosing that the market was charging any individual bank a much higher interest rate than others would have shown the market that the bank was at greater risk of default than others. Defendant banks did not want the market to identify them as risky. By reporting false Libor rates, Defendants also took advantage of trading opportunities their inside information would provide in the Libor-based derivative market. Regulators are currently investigating whether Defendants shared not-yet-publicly disclosed information regarding their Libor quotes with their respective proprietary derivatives trading desks.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1331 and 1337, respectively.

7. Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b) and (c). The claims arose in the Northern District of Illinois, and a substantial part of the events or omissions giving rise to the claims

occurred in the Northern District of Illinois. Defendants' unlawful acts manipulated the prices of Exchange Traded Libor-Based Derivatives which are traded in this District at the CME and the CBOT, which are both located in Chicago, Illinois. On July 12, 2007, the CBOT, the world's oldest futures and options exchange which was established in 1848, merged with the CME to form the CME Group, Inc., which is also headquartered in Chicago, Illinois.

8.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

9.     Plaintiff Jeffrey Laydon purchased and sold Exchange Traded Libor-Based Derivatives, including CME Eurodollar futures contracts, during the Class Period, at artificial prices. Plaintiff was damaged by reason of Defendants' unlawful conduct, which deprived Plaintiff and the Class of a non-manipulated, competitive market in Exchange Traded Libor-Based Derivatives.

10.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Switzerland company headquartered in offices in Zurich, Switzerland. At all relevant times, Credit Suisse was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

11.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. During the Class Period, Bank of America was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

12.     Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware financial

holding company headquartered in New York, New York. During the Class Period, JP Morgan was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

13.    Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England. During the Class Period, HSBC was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

14.    Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. During the Class Period, Barclays was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

15.    Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB"). During the Class Period, both HBOS and Lloyds TSB were contributing members of the British Bankers' Association's U.S. dollar Libor panel.

16.    Defendant WestLB AG ("WestLB") is a Germany joint stock company headquartered in Dusseldorf, Germany. During the Class Period, WestLB was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

17.    Defendant UBS AG ("UBS") is a Switzerland company based in Basel and Zurich, Switzerland. During the Class Period, UBS was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

18.    Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a United Kingdom public limited company headquartered in Edinburgh, Scotland. During the Class Period, Royal Bank of Scotland was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

19.     Defendant Deutsche Bank AG ("Deutsche Bank") is a Germany financial services company headquartered in Frankfurt, Germany. During the Class Period, Deutsche Bank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

20.     Defendant The Norinchukin Bank is a Japan cooperative bank headquartered in Tokyo, Japan. During the Class Period, The Norinchukin Bank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

21.     Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York. During the Class Period, Citibank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

22.     Defendant Bank of Tokyo-Mitsubishi UFJ Ltd ("Bank of Tokyo-Mitsubishi") is a subsidiary of Mitsubishi UFJ Financial Group, Inc. (MUFG) and is headquartered in Tokyo, Japan. During the Class Period, Bank of Tokyo-Mitsubishi was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

23.     Defendant Rabobank Group ("Rabobank") is a financial services provider with offices worldwide and its main headquarters in the Netherlands. During the Class Period, Rabobank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

24.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Ontario. During the Class Period, RBC was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

25.     Defendant Société Générale is a major European financial services company and is headquartered in Paris, France. During the Class Period, Société Générale was a contributing

member of the British Bankers' Association's U.S. dollar Libor panel.

**SUBSTANTIVE ALLEGATIONS**

**I.      Background**

**A.      Overview of Futures, Options and Swap Contracts**

26.      Both the CME and CBOT have been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. ' 7. Both of the CME and CBOT submit to the CFTC various rules and regulations for approval through which the CME and CBOT design, create the terms of, and conduct trading in various commodity futures, options and swap contracts, including Exchange Traded Libor-Based Derivatives.

27.      A futures contract is an agreement to buy or sell a commodity, such as a Eurodollar, at a date in the future. Every aspect of a futures contract traded on the CME, such as a Eurodollar futures contact, is standardized, except the price. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

28.      Futures contracts have two sides. The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity if the buyer holds the contract until the delivery date. The "short" side is the seller of the contract and is obligated to make delivery of the commodity on the delivery date.

29.      An option contract on a future is a contract that gives the owner of the option the right, but not the obligation, to be long or short a futures contract at a specified price within a specified time period. The specified price is called the strike price. The futures contract that the owner of a call option or a put option may establish by exercising the option is referred to as the underlying futures contract. An option buyer is one who purchases an option and pays a

premium. An option seller is one who sells an option and receives a premium. Premiums are arrived at through open competition between buyers and sellers on the CME. A put option is the option to sell a futures contract, and a call option is the option to buy a futures contract. At all relevant times during the Class Period, options on Exchange Traded Libor-Based Derivatives were traded.

30.     Only a small percentage of all futures and options contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of rice by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

31.     Swaps are contracts to exchange cash (flows) on or before a specified future date based on the underlying value of interest rates, commodities, stocks or other assets. For example, in the case of a swap involving two bonds, the benefits in question can be the periodic interest (or coupon) payments associated with the bonds. Specifically, the two counterparties agree to exchange one stream of cash flows against another stream. These streams are called the legs of the swap. The swap agreement defines the dates when the cash flows are to be paid and the way they are calculated. Usually at the time when the contract is initiated at least one of these series of cash flows is determined by a random or uncertain variable such as an interest rate, foreign exchange rate, equity price or commodity price.

**B.      The London Interbank Offered Rate**

32.     Libor is the interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. Libor's primary function is to provide a point

of reference for unsecured loans between London based banks. As such, it measures the cost of capital for a Libor contributor bank. The higher the credit risk for a Libor bank, the higher the rate that bank would have to pay for borrowed funds, thus leading to higher Libor rates. Libor is owned by the BBA, an organization funded primarily by subscriptions from its members.

33.     Libor is the most widely referenced interest rate index in the world. For instance, Libor serves as the basis for settlement (or "underlying commodity") of interest rate futures and options contracts traded on the CME and CBOT, the world's most significant Libor-based interest rate futures, options, and swaps exchanges. Libor anchors contracts amounting to some $300 trillion, the equivalent of $45,000 for every human being on the planet.

34.     Libor is calculated and published by Reuters on behalf of the BBA after 11:00 a.m. (and generally around 11:45 a.m.) each day UK time for 10 major currencies (Australian dollar, British pound, Canadian dollar, European euro, Danish krone, Japanese yen, New Zealand dollar, Swedish krona, Swiss franc, and US dollar) and for several maturities, ranging from overnight to one year. The four major Libor currencies are US Dollar, Sterling, Euro and Yen.

35.     The BBA selects only 16 banks to provide daily rate quotes for the calculation of Libor. The BBA website states that this "reference panel of banks ... reflects the balance of the market by country and by type of institution. Individual banks are selected within this guiding principle on the basis of reputation, scale of market activity, and perceived expertise in the currency concerned." For each currency and maturity, Libor contributor banks submit to Reuters the rate at which a contributing bank believes it could borrow funds should it wish to do so, by asking for and then accepting inter bank offers in a reasonable market size just prior to the fix time (11:00 am UK time). The rates submitted by each contributor bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon what a bank

could do, not what it has done. Thus, Libor depends on the integrity of the contributor banks.

36.     For the U.S.-denominated Libor, the sixteen contributor banks (Defendants herein) submit daily rate quotes to the BBA, the middle 8 rate quotes submitted are converted into Libor via a simple arithmetic mean.

## C.     Exchange Traded Libor-Based Derivatives

37.     The world's most actively exchange traded Libor-based derivatives (futures, options and swap contracts) are traded on the CME and CBOT by open-outcry on trading floors in Chicago, Illinois, and also on the CME's GLOBEX electronic trading platform.

38.     The CME and CBOT, both headquartered in Chicago, are the largest and most diverse interest rate financial futures, options, and swaps exchange in the world. CME and the CBOT trade more short-term interest rate futures and options contracts than any other exchange in the world.

39.     By far, the most active and economically important exchange traded Libor-based derivative is the CME's 3-Month Eurodollar futures contract, which is the most actively traded futures contract in the world. Eurodollars are U.S. dollars deposited in commercial banks outside the United States. Eurodollar futures prices are meant to reflect market expectations for interest rates on Eurodollar deposits for specific dates in the future.

40.     The 3-Month CME Eurodollar futures contract is cash settled based on the three-month US dollar Libor rate prevailing at contract expiration. In particular, the underlying commodity for each Eurodollar futures contract is a Eurodollar time deposit having a principal value of USD $1,000,000 with a three-month maturity.

41.     The CME 3-Month Eurodollar futures contract is quoted in three-month Libor index points or 100 minus the rate on an annual basis over a 360 day year (e.g., a rate of 2.5% is

quoted as 97.50).

42.     The contract months for CME 3-Month Eurodollar futures contracts are March, June, September, and December, extending out 10 years (total of 40 contracts) plus the four nearest serial expirations (months that are not in the March quarterly cycle). The new contract month terminating 10 years in the future is listed on the Tuesday following expiration of the front quarterly contract month.

43.     Trading in a CME 3-Month Eurodollar futures contract terminates at 11:00 a.m. London Time on the second London bank business day prior to the third Wednesday of the contract expiry month ("contract expiration"). The final settlement price of an expiring CME 3-Month Eurodollar futures contract is 100 minus the three-month Eurodollar interbank time deposit rate determined at the BBA Libor fixing at contract expiration.

44.     Other significant exchange-traded Libor-based derivatives include the CME 1-Month Libor futures contract, the mini-sized Eurodollar futures contract, and CBOT 5-Year, 7-Year, 10-Year, and 30-Year Interest Rate Swap futures contracts.

45.     The CME 1-Month futures contract is cash settled to the BBA's survey of 1-month Libor on the second London bank business day prior to the third Wednesday of the contract month.

46.     The mini-sized Eurodollar futures contracts has the same contract specifications of the 3-Month Eurodollar futures contract, but the unit of trading include three-month Eurodollar time deposits in the amount of $500,000, not $1,000,0000 (one-half the size of the Eurodollar conventional futures contracts). Mini-sized Eurodollar futures allow hedging short term interest rate risk, executing a variety of trading strategies such as Butterflies, Packs and Bundles, and expressing a view on the direction of interest rates.

47.     CBOT 5-Year, 7-Year, 10-Year, and 30-Year Interest Rate Swap futures contracts are cash-settled to the International Swaps and Derivative Association (ISDA) Benchmark Rate for a 5-year, 7-Year, 10-year, or 30-Year U.S. dollar interest rate swap on the last day of trading published at approximately 10:30 Chicago time, expressed in percent terms. The $100,000 par trading unit of these contracts represents the fixed-rate side of an interest rate swap that exchanges semiannual fixed-rate payments for floating-rate payments. The fixed payments are based on a fixed annual interest rate (e.g., 4% or 6% per annum) while the floating payments are based on 3-month Libor. The contracts trade in price terms quoted in points ($1,000 per point) and one-half of 1/32 of one point of the notional principal of a swap having notional par value of $100,000. The trading cycle for the contracts is March, June, September, and December—the same quarterly cycle as the other CBOT fixed-income contracts.

48.     The CME and CBOT also list options on Libor-based derivatives, including options on the 3-Month CME Eurodollar futures contract and the 1-Month Eurodollar futures contact. The exchanges offer three different types of options: quarterly, serial and mid-curve.

49.     For instance, Eurodollar quarterly options are traded on Eurodollar futures expiring in March, June, September and December. The last day of trading of the quarterly options is 11:00 a.m. UK time on the second London bank business day preceding the third Wednesday of the contract month. Quarterly options are cash settled. Eurodollar serial options are traded on the next quarterly futures contract months expiring in January, February, April, May, July, August, October and November. The last day of trading in the serial options is 2:00 p.m. Chicago time on the Friday preceding the third Wednesday of the contract month. Serial options are settled by positions in front quarterly futures contracts. Eurodollar mid-curve options are short-dated American-style options on long-dated Eurodollar futures. These options, with a

time to expiration of three months to one year, have as their underlying instrument Eurodollar futures one, two, or five years out on the yield curve. Mid-curve options provide a wide variety of hedging and trading opportunities on the mid-range of the yield curve – hence the name "mid-curve" options.

## II.     The Defendants' Unlawful Manipulation of Libor Rates

50.     Beginning as early as 2006 and continuing though at least 2009, the Defendants herein, as Libor contributor banks, intentionally caused and created artificial Libor rates, including artificially suppressed Libor rates, by submitting false Libor rates to the BBA. Such artificial Libor rates, as Defendants knew and intended, directly and proximately caused Exchange Traded Libor-Based Derivatives to trade at artificial levels, including artificially depressed prices, during the Class Period in violation of the CEA, the Sherman Act, and Illinois law.

51.     During the Class Period, three major sets of news items were announced in the public press which have been pointed by many as the "official start" of the worst financial crisis since the Great Depression, including: (a) a "coordinated intervention" by the European Central Bank, the Federal Reserve Bank, and the Bank of Japan; (b) AIG warning that defaults were spreading beyond the subprime sector; and (c) BNP Paribas suspension of three funds that held mortgage backed securities.

52.     Notwithstanding the incredible stresses on banks caused by the severe financial crisis, the Defendants herein continued to report Libor rates to the BBA in a narrow band when these rates are supposedly submitted independently and on a daily basis, without knowledge of the quotes by all other Libor contributor banks, and despite the fact that the contributor banks have very different lending and financing requirements.

53.     For example, for the first four months of 2008, the three-month Libor borrowing rates reported by Defendants remained, on average, within a range of only 0.06 of a percentage point. This fact did not correspond to traditional market behavior because in times of severe uncertainty, banks would normally be reluctant to lend to one another on an unsecured basis without receiving a higher risk premium. In a non-manipulated market, Libor rates should have increased significantly during this period. In addition, because different banks were experiencing different levels of severe stress, the banks should have been receiving markedly different borrowing rates. None of this was reflected in the Libor rates reported by Defendants. According to a Stanford University finance professor, these reported rates "[were] far too similar to be believed."

54.     Furthermore, when compared with other reliable measures of bank risk, such as federal funds trades (which require collateral) and the credit default market, the reported Libor rates of the contributing banks all were underpriced. For example, in 2008, the Federal Reserve auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82% — 0.1% percentage point higher than the comparable Libor rate. However, because banks put up securities as collateral for the Federal Reserve loans, they should have received them for a lower rate than Libor, which is unsecured. Despite clear reasons why Libor should have been higher, the reported Libor did not reflect this market reality.

55.     On the afternoon of March 10, 2008, investors in the credit default market were estimating that defendant WestLB, which was hit hard by the financial credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse Group, a Swiss bank that was perceived to be in better shape. Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse.

56.     Defendant Citibank's reported rates differed the most from what the credit default market suggested. On average, the rates at which Citibank said that it could borrow dollars for three months (*i.e.*, its Libor rates) were about 0.87 percentage points lower than the rate calculated using default-insurance data. The difference was 0.7 percentage points for WestLB, 0.57 for HBOS, 0.43 for JP Morgan, and 0.42 for UBS. Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and Royal Bank of Scotland also differed from their expected credit default market rates by about 0.3 percentage points.

57.     The money market committee of The Bank of England in November 2007 and again in April 2008 raised questions about the integrity of Libor.  In November 2007, minutes of the meeting stated that, "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress." On April 3, 2008, minutes of the committee's discussions say that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates." Although BBA and at least some defendant banks were members of this committee, BBA later announced that Libor continued to be reliable even in times of financial crisis. BBA's conduct served to aid Defendants in fraudulently concealing their conduct.

58.     On April 16, 2008, under the headline "Finance markets on edge as trust in Libor wanes," the *Wall Street Journal* reported a claim by Scott Peng, an analyst at Citigroup, that although, because of the credit crunch, Libor was already high relative to the rates set by central banks, it should be even higher. Three-month US dollar Libor, Peng suggested, should actually be 30 basis points higher than it was – a difference that represents huge amounts of money, given the trillions of dollars indexed to it. The BBA responded by telling the *Wall Street Journal* that it was monitoring inputs closely and that if it was "deemed necessary", it would "take action to preserve the reputation and standing in the market of our rates" – a warning that the *Wall Street*

*Journal* read as a threat to remove any bank making dubious inputs. Over the next two days, **three-month dollar Libor rose by 16 basis points.** Suspiciously, other lending rates for other currencies fell or remained relatively flat at the time Libor surged, a sign that the dollar Libor rate was susceptible to manipulation.

59.     In a note to clients following the surge in Libor rates in mid-April 2008, UBS strategist William O'Donnell suggested that banks were responding to the heightened scrutiny, saying that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market." Also, William Porter, credit strategist at Credit Suisse, said he believed the three-month dollar rate is 0.4 percentage points below where it should be. That echoed the view of Mr. Peng who believed that said that Libor understated banks' true borrowing costs by as much as 30 basis points.

60.     According to a May 29, 2008 Bloomberg News article, Tim Bond, a strategist at Barclays Capital, a Defendant herein, represented that banks routinely misstated borrowing costs to the BBA to avoid the perception they faced difficulty raising funds as credit markets seized up:

> "The rates the banks were posting to the BBA became a little bit divorced from reality," Bond, head of asset- allocation research in London, said in a Bloomberg Television interview. "We had one week in September where our treasurer, who takes his responsibilities pretty seriously, said: 'right, I've had enough of this, I'm going to quote the right rates.' All we got for our pains was a series of media articles saying that we were having difficulty financing.'" Also according to the news article, Barclays Plc, the U.K.'s third-biggest bank and parent of Barclays Capital, quoted three-month dollar rates to the BBA that averaged 7 basis points more than those of their peers in the first week of September. Barclays dropped 9.1 percent on the London Stock Exchange that week, compared with the 5.5 percent decline in the 59-member Bloomberg Europe Banks and Financial Services Index. "Other banks tried to push their head above the parapet on occasions as well, but with every attempt you were met with a lot of rumor and innuendo," Bond said in the interview. "It wasn't a very easy environment."

61.     On June 2, 2008, The Financial Times reported that "... the rate of borrowing in

Libor has lagged behind other market-based measures of unsecured funding used by the vast majority of financial institutions. This has aroused suspicions that the small group of banks which supply the BBA with Libor quotes have understated true borrowing rates so as not to fan fears (that) they have funding problems."

62.     On April 16, 2008, the BBA announced that it would review the integrity of Libor.   In December 2008, the BBA released a report entitled Libor Governance and Scrutiny which did add more banks to the Libor reporting group but did not address whether false rates had been submitted.

**B.**     **Governmental Investigations**

63.     Several U.S. government agencies, including the Commodity Futures Trading Commission and the U.S. Department of Justice, have commenced investigations into the Libor reporting practices of Defendants during the Class Period.

64.     The fact of the investigations came to light on March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Commodity Futures Trading Commission, U.S. Department of Justice and other U.S. government agencies, as well as an information request from the Japanese Financial Supervisory Agency, relating to its Libor rate submissions to the BBA.

65.     The Financial Times reported that "[a]ll the panel members are believed to have received at least an informal request for information — an earlier stage in an investigation process before a subpoena."

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on his own behalf and as representative of a class ("Class")

defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates, and co-conspirators) that purchased or sold Exchange Traded Libor-Based Derivatives[2] on the Chicago Mercantile Exchange or Chicago Board of Trade during the period from at least January 1, 2006 through and including December 31, 2009 (the "Class Period").

67. The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Exchange-Traded Libor-Based derivatives during the Class Period.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

      a.      Whether Defendants' acts constituted a manipulative or unlawful act;

      b.      Whether Defendants injected into the Exchange Traded Libor-Based Derivatives illegitimate forces of supply and demand;

      c.      Whether Defendants manipulated prices of Exchange Traded Libor-Based Derivatives to artificial levels in violation of the CEA;

      d.      Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize Exchange Traded Libor-Based Derivatives prices in violation of the antitrust laws;

      e.      The character, extent, and duration of Defendants' manipulation of Exchange Traded Libor-Based Derivatives;

---

[2] Exchange Traded Libor-Based Derivatives include: CME 1-Month Eurodollar futures and options contracts, CME 3-Month Eurodollar futures and options contracts, CBOT mini-sized Eurodollar futures and options contracts, and CBOT 5-Year, 7-Year, 10-Year, and 30-Year Interest Rate Swap futures and options contracts. Plaintiff reserves the right to amend or modify the class definition.

f.      Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

g.      The fact and degree of impact on prices of Exchange Traded Libor-Based Derivatives resulting from Defendants' course of unlawful conduct; and

h.      The appropriate measure of relief.

69.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and antitrust class action litigation.

71.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of

inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

72.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

73.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants engaged in secret and surreptitious activities in order to manipulate Libor rates to artificial levels.

74.     Defendants fraudulently concealed their manipulative acts by, among other things, willfully concealing from the CME, CBOT and the market their unlawful manipulation of Libor rates reported to the BBA.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than public disclosures thereof.

75.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence on or before March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Commodity Futures Trading Commission, U.S. Department of Justice, and other U.S. government agencies, as well as an information request from the Japanese Financial Supervisory Agency, relating to its interest rate submissions to the BBA.

76.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

77.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## AS AND FOR A FIRST CLAIM FOR RELIEF
## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

78.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

79.     By their intentional misconduct, the Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of Exchange Traded Libor-Based Derivatives to be artificial, including artificially suppressed, during the Class Period.

80.     Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Exchange Traded Libor-Based Derivatives in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

81.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

82.     Plaintiff and others who transacted in Exchange Traded Libor-Based Derivatives during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

83.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR RELIEF
## VICARIOUS LIABILITY FOR MANIPULATION

84.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

85.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C.

§ 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons

acting for them in the scope of their employment.

## AS AND FOR A THIRD CLAIM FOR RELIEF
## AIDING AND ABETTING VIOLATIONS OF THE COMMODITY EXHANGE ACT

86.    Plaintiff incorporates by reference and re-alleges the preceding allegations as

though fully set forth herein.

87.    Defendants knowingly aided, abetted, counseled, induced and/or procured the

violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation

of Libor, and willfully intended to assist these manipulations, which resulted in Exchange Traded

Libor-Based Derivatives to reach artificial levels, including artificially depressed levels, during

the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

## AS AND FOR A FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

88.    Plaintiff incorporates by reference and re-alleges the preceding allegations as

though fully set forth herein.

89.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of

trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

90.    During the Class Period, Defendants possessed market power in the market for

the purchase and sale of Exchange Traded Libor-Based Derivatives.

91.    The conspiracy consisted of a continuing agreement, understanding or concerted

action between and among Defendants and their co-conspirators in furtherance of which

Defendants fixed, maintained, suppressed and/or made artificial prices for Exchange Traded

Libor-Based Derivatives.  Defendants' conspiracy is a *per se* violation of the federal antitrust

laws and is, in any event, an unreasonable and unlawful restraint of trade.

92.    Defendants' conspiracy, and resulting impact on the market for Exchange Traded Libor-Based Derivatives, occurred in or affected interstate and international commerce.

93.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

94.    Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

### AS AND FOR A FITH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
(815 ILCS §505/1 *et seq.*)

95.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

96.    Defendants engaged in unfair competition and unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud Act, 815 ILCS §505/1 *et seq.* when the Defendants herein, as Libor contributor banks, knowingly submitting false Libor rates to the BBA.  By reporting false Libor rates, Defendants intended to manipulate the Libor rates and knowingly created artificial prices of Exchange Traded Libor-Based Derivatives.  Such artificial Libor rates directly and proximately caused Exchange Traded Libor-Based Derivatives to trade at artificial levels, including artificially depressed levels.  As a direct and proximate result of Defendants' unfair competition and unfair or deceptive acts or practices, Plaintiff and Class purchased and sold Exchange Traded Libor-Based Derivatives at artificial prices during the Class Period, and as a direct result thereof were injured and suffered damages.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT AND RESTITUTION

97.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

98.     It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

99.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

100.    Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and their counsel as Class counsel;

(B)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(D)     For a judgment awarding Plaintiff and the Class damages against Defendants for their unfair or deceptive acts or practices in violation of 815 ILCS §505/1, *et seq.*;

(E)     For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(F)     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(G)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(H)     For such other and further relief as the Court may deem just and proper.

/

/

/

/

/

/

/

/

/

/

/

/

/

# JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: Chicago, Illinois
      April 27, 2011

COLEMAN LAW FIRM

By:   /s/ Steve Jakubowski
    Robert F. Coleman, Esq.
    A.R.D.C. #: 00485004
    Steve Jakubowski, Esq.
    A.R.D.C.#: 06191960
    77 West Wacker Drive
    Suite 4800
    Chicago, Illinois 60601
    Tel: (312) 444-1000
    Fax: (312) 444-1028

DOUGLAS M. CHALMERS, PC
Doug M. Chalmers, Esq.
A.R.D.C. #: 6200986
77 West Wacker Drive
Suite 4800
Chicago, IL 60601
Tel.: 312-606-8700
Fax: 312-444-1028

LOWEY DANNENBERG COHEN
& HART, P.C.
Vincent Briganti, Esq.
Geoffrey Horn, Esq.
One North Broadway
White Plains, New York, 10601
Tel.: 914-997-0500
Fax: 914-997-0035

*Attorneys for Plaintiff*